# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **ANITA S. LAWSON,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:05cv00026 |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **JO ANNE B. BARNHART**, | ) | |
| **Commissioner of Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I will vacate the final decision of the Commissioner denying benefits and remand this case for further consideration by the Commissioner.

## *I. Background and Standard of Review*

Plaintiff, Anita S. Lawson, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"),  under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423.  (West 2003 & Supp. 2005).  Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

Case 2:05-cv-00026-PMS   Document 16   Filed 11/21/05   Page 1 of 25   Pageid#: 76

application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Lawson protectively filed her application for DIB on or about September 29, 1999, alleging disability as of September 24, 1999, based on lupus, hypothyroidism and fibromyalgia. (Record, ("R."), 79, 80-89, 91.) Lawson's claim was denied both initially and on reconsideration. (R. at 55-57, 58, 60-61.) Lawson then requested a hearing before an administrative law judge, ("ALJ"), (R. at 62.) The ALJ held a hearing on September 26, 2000, at which Lawson was represented by counsel. (R. at 419-36.)

By decision dated September 29, 2000, the ALJ denied Lawson's claim based on his finding that she could perform her past relevant work. (R. at 39-43.) After the ALJ issued his decision, Lawson pursued her administrative appeals, (R. at 35), and the Appeals Council granted her request for review and remanded her claim to the ALJ for further evaluation of Lawson's alleged mental impairment. (R. at 64-66.) On remand, the ALJ held an additional hearing on October 8, 2003, at which Lawson was represented by counsel. (R. at 437-73.) At this hearing, Lawson's counsel amended her alleged onset date to April 1, 2001. (R. at 439-40.)

-2-

By decision dated October 31, 2003, the ALJ again denied Lawson's claim based on a finding that Lawson did not suffer from a severe impairment. (R. at 19-25.) Thus, the ALJ found that Lawson was not disabled as defined by the Act and was not eligible for benefits. (R. at 25.) *See* 20 C.F.R. § 404.1520(c) (2005). Oddly enough, the ALJ, in his October 31, 2003, decision, did not make a finding as to whether Lawson was insured for DIB purposes. In his September 29, 2000, decision, the ALJ found that Lawson was insured for DIB purposes through December 31, 2004. (R. at 39.)

After the ALJ issued this decision, Lawson pursued her administrative appeals, (R. at 13), but the Appeals Council denied her request for review. (R. at 7-9.) Lawson then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2005). The case is before this court on Lawson's motion for summary judgment filed October 3, 2005, and the Commissioner's motion for summary judgment filed November 7, 2005.

## II. Facts

Lawson was born in 1961, (R. at 80), which classifies her as a younger person under 20 C.F.R. § 404.1563(c). She has a high school education and past relevant work experience as a bank teller and an assistant manager of a fast food restaurant. (R. at 92, 97, 422-24 .)

At her hearing, Lawson testified that she last worked in the credit department of a bank. (R. at 422.) Lawson testified that she experienced pain in her feet

-3-

constantly. (R. at 425.) She also said that she experienced pain in her knees, back, shoulders and neck every day. (R. at 425.) Lawson stated that she could stand for only five to 10 minutes at a time and sit for only 30 minutes at a time. (R. at 427.) Lawson said that she could walk for only 10 to 15 minutes at a time and carry items weighing up to only 20 pounds. (R. at 427.)

Lawson also testified that she experienced panic attacks and anxiety. (R. at 428.) Lawson stated that she had experienced these attacks as often as three times a week before being prescribed Paxil. (R. at 428-29.) As a result of taking Paxil, Lawson said that the attacks had decreased to once or twice a week. (R. at 429.) Lawson testified that she also had difficulty with her attention span and had experienced crying spells. (R. at 429.)

At her second hearing, Lawson testified that she had received counseling from Laurie Ramsden, but she stated that she had to quit because she could no longer afford it. (R. at 442.) Lawson stated that, at the time of the hearing, she was no longer in counseling. (R. at 442.) Lawson also testified that her condition had worsened since her first hearing, in that her pain, depression and anxiety were worse. (R. at 442-43.) Lawson stated that she experienced pain constantly in her feet, legs, hands, shoulders and back. (R. at 443.) Lawson stated that she could stand for only 15 to 20 minutes at a time and sit for only 20 minutes at a time. (R. at 443-44.) Lawson stated that her pain forced her to recline in a recliner four or five times a day for 20 to 30 minutes at a time in an effort to alleviate it. (R. at 444.) Lawson stated that due to her depression, she did not want to go anywhere or speak to anyone. (R. at 447.) Lawson stated that she felt helpless, had low self-esteem and experienced crying spells once or twice a

-4-

week. (R. at 447.)

A medical expert, Dr. Theron Blickenstaff, M.D., testified at Lawson's 2003 hearing. ( R. at 453-55.) Dr. Blickenstaff testified that, based on his review of the medical evidence, there was very little objective evidence of Lawson suffering from a musculoskeletal problem, other than some evidence of a couple of trigger points. (R. at 453.) Dr. Blickenstaff also stated that Lawson did not suffer from a severe physical impairment. (R. at 454.)

Thomas Schacht, Ph.D., a psychologist, also testified at Lawson's 2003 hearing. (R. at 455-59.) Schacht stated that because of the conflicts in the medical records regarding Lawson's alleged psychological symptoms, he could not form an opinion as to whether she suffered from a severe mental impairment. (R. at 455-56.)

In rendering his decision, the ALJ reviewed records from Norwise OB/GYN; Dr. Michael W. Bible, M.D.; Dr. M.F. Monohan, M.D.; Dr. Souhail G. Shamiyeh, M.D.; Dr. Frank M. Johnson, M.D., a state agency physician; Dr. Michael Hartman, M.D., a state agency physician; Dr. Andrew Chapman, D.P.M.; Dr. S. K. R. Udupa, M.D.; Dr. Gayle S. Vest, M.D.; Dr. Donald Ferris, D.P.M.; Wellmont Rehabilitation and Sports Clinic; Counseling Associates of Abingdon; Julie Jennings, Ph.D., a state agency psychologist; Hugh Tenison, Ph.D., a state agency psychologist; Robert Spangler, Ed.D., a licensed psychologist; R. J. Milan Jr., Ph. D., a state agency psychologist; Family Drug Center; and B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist. Lawson's attorney also submitted additional reports from Dr. Rodolfo

Cartagena, M.D.; Dr. Chapman; Arthritis Associates and Dr. Ronald Smith.[1]

The record shows that Lawson began treatment with Dr. Gayle Vest, M.D., of Norwise OB/GYN, in 1988 for complaints of amenorrhea and infertility. (R. at 143-44.) Lawson continued to treat with Dr. Vest and Dr. Rodolfo Cartagena, M.D., for these complaints and routine gynecological care through 2002. (R. at 128-44, 260-61, 398.) The record also shows that Lawson had a diagnositic abdominal laproscopy performed in August 1991 which ruled out endometriosis or other physical abnormality as a cause of her infertility. (R. at 135.) Dr. Vest's records do show that Lawson complained of bad mood swings, irritability and panic attacks in January 1999. (R. at 128-29.) Lawson also reported that she had been diagnosed with lupus in 1993 or 1994. (R. at 129, 131.)

In October 2000, Lawson told Dr. Vest that she was doing "okay" with her lupus, was not taking any medication and had stopped treatment with Dr. Bible. (R. at 261.) Lawson did complain of problems with her feet. (R. at 261.) Lawson stated that she did not work full-time anymore, but that she did fill in at the bank when employees were out on leave or vacation. (R. at 260.) She also said that she was "becoming more and more involved with helping her husband who is pastoring a church with all the church activities." (R. at 260.)

_____

[1]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 7-9), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

On July 7, 1993, Lawson saw Dr. S. K. R. Udupa, M.D., for a swelling over the anterior aspect of the mid-portion of the right leg starting three weeks prior. (R. at 200.) Lawson reported no history of trauma, and she stated that she suffered from no medical problems other than thyroid problems. (R. at 200.) Dr. Udupa ordered a bone scan and blood tests be performed. (R. at 200.)

A bone scan performed on July 13, 1993, showed only a slight increased uptake in the mid portion of the right lower leg. (R. at 205.) An MRI was recommended and was performed on July 29, 1993. (R. at 204, 205.) The MRI revealed an abnormal area on the anterior aspect of the mid-portion of the right leg. (R. at 204.) As a result, Dr. Udupa performed a biopsy and removed a tumor from Lawson's leg on August 24, 1993. (R. at 202.) The tumor was found to be benign. (R. at 203.) Dr. Udupa's September 20, 1993, report notes that, despite suffering a staph infection, for which Lawson had been prescribed antibiotics, her surgical wound was well healed and she was ambulating fully weight bearing. (R. at 199.)

The record reveals that Lawson treated with Dr. M.F. Monohan, M.D., from 1993 to 1999. (R. at 155-57, 242-48.) When Lawson first saw Dr. Monohan on December 30, 1993, she complained of a history of hypothyroidism and some occasional arthritis pains in her knees and hips with occasional swelling. (R. at 248.) On May 27, 1994, Lawson complained of back pain. (R. at 246.) Dr. Monohan found Lawson's lumbosacral area to be tender, but her straight leg raises were negative. (R. at 246.) He prescribed ibuprofen and Flexeril. (R. at 246.) When Dr. Monohan saw Lawson on September 14, 1994, she reported "not a lot of problems." (R. at 246.) On May 18, 1995, Lawson complained of exhaustion and aches and pains. (R. at 245.)

-7-

On January 9, 1996, Lawson saw Dr. Monohan complaining of arthritis pain in her feet, legs, hips, hands and arms. (R. at 244.) On July 9, 1996, Lawson stated she was "overall better." (R. at 244.) She said she was weak and run down, but that she felt better. (R. at 244.) Dr. Monohan noted that there was no swelling of her joints. (R. at 244.) Dr. Monohan's records contain a note dated January 9, 1997, which states that Lawson requested a referral to see another physician "regarding lupus." (R. at 243.) The note is followed by a question mark. (R. at 243.) Dr. Monohan's notes contain no diagnosis of or treatment for lupus.

On June 16, 1998, Lawson told Dr. Monohan that she had "no problems at present" other than normal, everyday bone pains. (R. at 157.) Dr. Monohan diagnosed hypothyroidism and arthritis. (R. at 157.) On February 3, 1999, Dr. Monohan again saw Lawson and diagnosed sinusitis/bronchitis in addition to arthritis. (R. at 157.) On May 21, 1999, Lawson complained of feeling tired, weak and draggy with a lot of arthritis in her knees, feet and back. (R. at 156.) On May 24, 1999, Dr. Monohan referred Lawson to Dr. Michael W. Bible, M.D., a rheumatologist. (R. at 155.) On July 14, 1999, Lawson complained of staying "wore out" and exhausted all of the time. (R. at 155.) She complained of back pain and stated that Dr. Bible had given her an injection in her back. (R. at 155.) Dr. Monohan found Lawson to be tender in her scapular area. (R. at 155.) His impression was that Lawson suffered from fibromysitis/fibromyalgia. (R. at 155.)

When Dr. Bible saw Lawson on February 25, 1998, he stated that he had previously seen her in 1996. (R. at 152.) Dr. Bible stated that Lawson had returned to see him because of pain in her lower back and occasional pain in the her lower

-8-

shoulders. (R. at 152.) Dr. Bible found that Lawson had good range of motion in her shoulders without pain. (R. at 152.) There was no evidence a radiculopathy in the cervical area. (R. at 152.) Dr. Bible found some trigger points in the lower lumbar paraspinal muscles on the left and right sides. (R. at 152.) Straight leg raises were negative. (R. at 152.) Dr. Bible diagnosed back pain secondary to a myofascitis involving the lower lumbar paraspinal muscles as well as a strained parttern. (R. at 152.) Dr. Bible instructed Lawson in some exercises. (R. at 152. ) He also gave her injections in her trigger points and a prescription for Flexeril. (R. at 152.)

On July 1, 1999, Lawson returned to Dr. Bible complaining of continued back pain. (R. at 151.) Dr. Bible found trigger points in the levator scapula muscle on the left and right sides and in the infraspinatus muscle on the left and right side. (R. at 151.) He gave Lawson a number of injections. (R. at 151.) Dr. Bible diagnosed levator scapula myofascitis on the left and right and infraspinatus myofascia syndrome on the left and right. (R. at 151.) Lawson returned to Dr. Bible on June 30, 2000, and received injections in her feet. (R. at 386.)

The record reveals that Lawson treated with the office of Dr. Souhail G. Shamiyeh, M.D., from 1999 to 2003. (R. at 167-70, 369-71) Lawson saw April Stidham, F.N.P. with Dr. Shamiyeh's office, on September 13, 1999. (R. at 167-70.) Lawson told Stidham that she suffered from hypothyroidism, fibromyalgia and lupus. (R. at 168.) Lawson complained of aches and pain, but without joint swelling, redness or warmth. (R. at 167, 168.) Lawson also complained of suffering from depression, anxiety and panic attacks. (R. at 167.) However, Lawson stated that no medication was needed for her depression. (R. at 167.) In fact, she stated that she had a

-9-

prescription for Effexor, which she had never gotten filled. (R. at 167.) She also stated that her anxiety was "better now." (R. at 167.) Lawson stated that she was currently taking Synthoid and birth control pills. (R. at 168.) She also stated that she had a prescription for Relafen. (R. at 168.) She stated that she took it on occasion, about once a week, and it helped. (R. at 168.)

When Lawson was seen on October 25, 1999, by Dr. Shamiyeh, she reported suffering from dizziness and decreased energy. (R. at 166.) Lawson reported that she had quit working about five weeks previously. (R. at 166.) She also complained of anxiety, depression and panic. (R. at 166.) Lawson stated that she was not sleeping well at night and was falling asleep during the daytime. (R. at 166.)

On January 4, 2000, Lawson stated that her fatigue was a "little" better, but that she was still having trouble getting up in the morning and had no energy. (R. at 164.) Lawson complained of suffering from fibromyalgia, but she stated that Relafen did not provide much relief. (R. at 164.) She stated that the pain occasionally would wake her up at night. (R. at 164.) Lawson said that she had quit working and her anxiety, depression and panic had decreased. (R. at 164.) On June 28, 2000, Lawson complained of alternating constipation and diarrhea, and Dr. Shamiyeh diagnosed possible irritable bowel syndrome. (R. at 239.)

Stidham saw Lawson again on September 5, 2000, complaining of weakness and heart palpitations. (R. at 235.) Lawson complained of anxiety, but denied any depression or panic. (R. at 235.) Lawson also complained of pain in her knees and feet. (R. at 235.) Stidham prescribed Vioxx, Paxil and Trazadone. (R. at 235.) Lawson

-10-

saw Stidham again on November 7, 2000, complaining of constant pain in her feet and back pain for the previous three weeks. (R. at 233.) Lawson stated that her heart palpitations had improved. (R. at 233.) Stidham noted that Lawson's anxiety and depression were stable on Paxil. (R. at 234.)

On December 4, 2000, Stidham wrote a letter stating that Lawson suffered from "multiple chronic ailments," including a history of hypothyroidism, lupus, elevated cholesterol, obesity, fibromyalgia, anxiety, depression, insomnia and plantar fasciitis. (R. at 232.) Stidham stated, "Due to these illnesses, [Lawson] felt she could not work or go on any longer with the above disabling illnesses as mentioned." (R. at 232.)

On December 5, 2000, Lawson saw Dr. Shamiyeh and reported no back pain and that her hip and knee pain had improved. (R. at 229.) Lawson also stated that her anxiety was better. (R. at 229.) On February 2, 2001, Lawson reported that her back was bothering her, especially in the mornings. (R. at 227.) She stated that her energy level was better and that the palpitations had decreased. (R. at 227.) Lawson denied any problems with anxiety, depression or panic. (R. at 227.) Dr. Shamiyeh ordered physical therapy to increase the range of motion of Lawson's back. (R. at 228.)

Lawson apparently attended an initial physical therapy evaluation and did not return for therapy. (R. at 264-67.) The records do reflect that Lawson reported good relief after the initial session. (R. at 264.)

On April 5, 2001, Lawson reported that her back pain had resolved. (R. at 225-26.) Lawson also reported that her complaints of anxiety and depression were stable

-11-

on her medication. (R. at 226.) On May 23, 2001, Lawson reported back and joint pain and stiffness. (R. at 223.) On September 27, 2001, Lawson complained of neck pain and was diagnosed with neck strain. (R. at 219.) On October 25, 2001, Lawson stated "it's always something hurting," which she attributed to suffering from lupus, fibromyalgia and thyroid problems. (R. at 217.) Lawson stated that her anxiety had decreased and her depression had improved. (R. at 217.)

On February 27, 2002, Lawson reported pain and aching all over. (R. at 215.) On April 30, 2002, Dr. Shamiyeh wrote a letter stating that Lawson was having problems with fibromyalgia and myofascitis, which were diagnosed by Dr. Bible. (R. at 214.) Dr. Shamiyeh stated that Lawson had a history of depression, anxiety, hypothyroidism and chronic low back pain. (R. at 214.) He stated, "I do think this patient's medical problems limit her ability to be engaged in a productive job environment." (R. at 214.) Dr. Shamiyeh did not, however, list any specific restrictions on Lawson's activities.

On June 19, 2002, Lawson returned to Stidham and Dr. Shamiyeh for a routine checkup. (R. at 210-11.) Lawson's feet were very tender to touch, but Dr. Shamiyeh noted no redness or swelling. (R. at 211.) On October 11, 2002, Lawson continued to complain of foot pain. (R. at 208.) Dr. Shamiyeh stated that posthetic inserts would help the pain, but that Lawson could not afford them. (R. at 208.) Lawson stated that her depression and anxiety and her fibromyalgia were doing better. (R. at 208, 209.)

On November 6, 2002, Dr. Shamiyeh wrote that Lawson was first seen in his office in September of 1999 with problems related to hypothyroidism, fibromyalgia

-12-

and possible lupus. (R. at 207.) Dr. Shamiyeh wrote that Lawson had a history of depression, anxiety and anemia. (R. at 207.) Dr. Shamiyeh stated that Lawson also was treated for irritable bowel syndrome and plantar fascitis. (R. at 207.) He stated that when he last saw Lawson on October 11, 2002, she had problems with joint pain. (R. at 207.) Dr. Shamiyeh's letter did not address any restrictions or limitations on Lawson's work-related abilities.

On February 6, 2003, Lawson saw Stidham and Dr. Shamiyeh complaining of arthritic aches and pains. (R. at 370.) On April 3, 2003, Lawson denied any anxiety. (R. at 369.) On July 30, 2003, Lawson complained of feeling tired with aches and pains all over. (R. at 389.) On September 25, 2003, Lawson returned with complaints of left hip pain. (R. at 387-88.) Lawson reported no other specific problems or complaints. (R. at 387.) Lawson stated that she had only experienced two panic attacks and that the last one occurred several years before. (R. at 387.) Stidham found an increased tenderness over the left trochanteric bursa area of Lawson's hip, but there was no swelling and she had a full range of motion. (R at 387.)

On September 16, 2003, Dr. Shamiyeh completed an assessment of Lawson's work-related abilities on which he found that Lawson could lift and carry items weighing up to less than 10 pounds. (R. at 390-93.) He also stated that Lawson could stand and/or walk for less than two hours in an eight-hour workday and must periodically alternate between sitting and standing. (R. at 390-91.) He stated that Lawson was limited in her ability to push and pull with her extremities and that she could never climb, balance, crouch or crawl. (R. at 391.)

-13-

On November 17, 1999, Dr. Frank M. Johnson, M.D., a state agency physician, completed an assessment of Lawson's physical abilities. (R. at 186-93.) According to Dr. Johnson, Lawson could occasionally lift and carry items weighing up to 50 pounds and frequently lift and carry items weighing up to 25 pounds. (R. at 187.) She could stand and/or walk for about six hours in an eight-hour day, and she could sit for about six hours in an eight-hour day. (R. at 187.) Dr. Johnson noted in his assessment that while Lawson alleged that she suffered from lupus, the record contained no such diagnosis. (R. at 187.) Instead the record revealed that Lawson had been diagnosed with fibromyalgia, arthritis and myofascitis. (R. at 187.) This assessment was affirmed by Dr. Michael Hartman, M.D., another state agency physician, on March 22, 2000. (R. at 193.)

Lawson saw Dr. Andrew Chapman, D.P.M., on August 22, 2000, on referral of Dr. Shamiyeh, for complaints of heel pain and soreness in her feet for the past five years. (R. at 196.) Lawson told Dr. Chapman that she had been diagnosed with lupus, fibromyalgia, a crooked spine, hypothyroidism and anemia. (R. at 196.) Lawson also stated that she had had a tumor removed from her right leg in 1994, which was related to her lupus. (R. at 196.) Dr. Chapman diagnosed suspected plantar fascitis and symptomatic metatarsus adductus. (R. at 197.) Dr. Chapman recommended a wrap for Lawson's feet and orthotics. (R. at 197.)

Lawson returned to Dr. Chapman's office on October 3, 2000, and he again recommended orthotics, which Lawson declined for financial reasons. (R. at 402.) Lawson saw Dr. Chapman again on February 25, 2004, and declined offered injections in her feet. (R. at 400.)

-14-

On November 8, 2000, Lawson was seen by Dr. Ronald L. Ferris, D.P.M, for her plantar fascitis. (R. at 262-63.) Lawson reported suffering from arthritis and a nervous condition. (R. at 262.) Lawson listed among her medications Paxil, Vioxx, Relafen and a muscle relaxant. (R. at 262.) Lawson also reported suffering from an irregular heart beat, shortness of breath and joint pains, but she denied any back problems. (R. at 262.)

Lawson began seeing Lauree A. Ramsden, a licensed clinical social worker with Counseling Associates of Abingdon, on February 21, 2001. (R. at 272.) Lawson complained of symptoms of depression and anxiety, including sadness, tearfulness, fatigue, loss of interest in daily activities, feelings of hopelessness, excessive feelings of guilt, constant worrying, tremors, multiple fears, jitteriness, poor concentration, insomnia and panic attacks. (R. at 272.) Lawson reported that she had been diagnosed with lupus and fibromyalgia. (R. at 272.) Ramsden diagnosed Lawson as suffering from a dsythymic disorder and panic disorder without agoraphopia. (R. at 272.) Ramsden saw Lawson again on March 12, 2001, and March 28, 2001, and focused on teaching her effective coping strategies for her anxiety and depression. (R. at 272.) Ramsden continued to treat Lawson through July 2001. (R. at 269.) Ramsden's notes in April and June 2001 mention that Lawson was no longer experiencing panic attacks. (R. at 270, 271.)

In a letter dated April 9, 2001, Ramsden stated that because of Lawson's symptoms, she was "unable to provide consistent, dependable services for any employer. (R. at 272-73.) Her poor concentration and short term memory impairment preclude her ability to complete simple or complex tasks. Additionally, the patient's

-15-

emotional lability makes her ability to cope with daily stressors very poor." (R. at 272.) Ramsden also completed a mental assessment of Lawson's work-related abilities which stated that Lawson had a seriously limited or no useful ability to perform all occupational, performance and personal/social adjustments other than an unlimited ability to follow work rules and to maintain appearance and a limited, but satisfactory, ability to use judgment. (R. at 274-75.)

On March 29, 2001, Julie Jennings, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), stating that, based on her review of the evidence of record, Lawson did not suffer from a severe mental impairment. (R. at 278-92.)  While Jennings mentioned that Lawson had begun counseling with Ramsden, she did not have any records from this treatment to review in forming her opinions. (R. at 292.)

On March 29, 2001, Dr. Hartman completed a Physical Residual Functional Capacity Assessment finding that Lawson was limited to lifting and carrying items weighing up to 50 pounds occasionally and up to 25 pounds frequently. (R. at 293-300.) Dr. Hartman stated that Lawson could stand and/or walk for a total of about six hours in an eight-hour day. (R. at 294.) He also found that Lawson could sit for a total of about six hours in an eight-hour day. (R. at 294.) Dr. Hartman's assessment was reviewed and affirmed by Dr. Randall Hays, M.D., another state agency physician, on May 30, 2001. (R. at 300.)

On May 30, 2001, Hugh Tenison, Ph.D., a state agency psychologist, completed a PRTF stating that, based on his review of the evidence of record, Lawson suffered from a severe impairment, but the impairment was not expected to last 12 months. (R.

-16-

at 301-14.) According to Tenison, Lawson had entered mental health treatment beginning in February 2001 and her condition was beginning to show improvement. (R. at 313.) Tenison stated that by February 2002, Lawson should have been able to return to semi skilled work. (R. at 313.)

On July 26, 2001, Robert S. Spangler, Ed.D., a licensed psychologist, performed a psychological evaluation of Lawson. (R. at 316-24.) Spangler stated that Lawson worked at a slow pace, was socially confident but anxious and her concentration was erratic secondary to anxiety. (R. at 316.) Spangler also stated that Lawson worked diligently, but was distractible and tense. (R. at 316.) Lawson complained of chronic muscle and joint pain. (R. at 317.) She stated that she could not stand for more than 10 minutes without pain in her feet. (R. at 317.) She stated that she had experienced three to four panic attacks per week since 1999. (R. at 317.)

Spangler found Lawson to be alert, oriented, anxious and nervous with adequate recall of recent and remote events. (R. at 318.) Lawson reported concentration problems which interfered with watching television and reading. (R. at 318.) Spangler administered the Wechsler Adult Intelligence Scale - III, ("WAIS-III"), but he found Lawson's scores to be invalid underestimates due to erratic concentration and slow pace. (R. at 319.) Spangler diagnosed Lawson with a pain disorder without agoraphobia and erratic concentration. (R. at 320.) Spangler completed an assessment of Lawson's work-related mental abilities, on which he indicated that Lawson had a limited or seriously limited ability in all occupational, performance and social/personal adjustments, except for no useful ability to understand, remember and carry out complex job instructions. (R. at 323-24.)

-17-

On December 10, 2001, R. J. Milan Jr., Ph.D., a state agency psychologist, completed a PRTF stating that Lawson suffered from a severe anxiety-related disorder which required a residual functional capacity assessment. (R. at 328-43.) Milan also indicated that Lawson experienced moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 338.) Milan also completed an assessment of Lawson's mental work-related abilities. (R. at 325-26.) Milan found that Lawson was moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance and to be punctual within customary tolerances, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and work week without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods and to interact appropriately with the public. (R. at 325-26.)

On December 11, 2001, Dr. Hays completed an assessment of Lawson's physical work-related abilities on which he indicated that she experienced no exertional or other limitations. (R. at 344-52.) Dr. Hays indicated that, while Lawson had a positive test indicator for lupus, there was no evidence that she suffered from any active disease. (R. at 346.) He stated that Lawson's complaints of pain in many areas of her body were not credible given the absence of any objective findings. (R. at 346.) Dr. Hays also noted that Lawson's plantar fascitis had been treated with Vioxx with good results. (R. at 346.)

B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, performed a psychological evaluation of Lawson on May 13, 2003. (R. at 373-82.) Lanthorn found

-18-

that Lawson was oriented with no signs of psychotic processes or delusional thinking. (R. at 373.) She denied any hallucinations. (R. at 373.) Lawson reported hurting all over at times, but reported that the most pain was in her lumbar region and her feet. (R. at 376.)

Lawson told Lanthorn that she had struggled with panic attacks for the past six years and depression for the past two or three years. (R. at 376.) She reported that Paxil helped her symptoms, but did not alleviate them. (R. at 376.) Lawson stated that her last panic attack was a year earlier and that she then-currently suffered more from generalized anxiety. (R. at 376.) She also reported despondency, frequent crying for no reason, a desire to be withdrawn and alone, the virtual absence of a sex drive, chronic fatigue, and difficulties with short-term memory loss and concentrating. (R. at 376.)

Lanthorn administered the Minnesota Multiphasic Personality Inventory - 2, ("MMPI-2"), which showed that Lawson was experiencing a moderate level of emotional distress characterized by dysphoria, worrying and anhedonia. (R. at 377.) Lanthorn indicated that the test results also showed that Lawson was having considerable problems with concentration and keeping her mind on a task or job. (R. at 377.) Lanthorn diagnosed Lawson with a pain disorder associated with both psychological factors and a generalized medical chronic medical condition. (R. at 378.) Lanthorn placed Lawson's Global Assessment of Functioning, ("GAF")," score at 50 to 55.[2] (R. at 378.)

---

[2]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32

Lanthorn also stated that Lawson's capacity to function cognitively was impeded by difficulties with concentration, short-term memory loss, difficulties in planning appropriately, a lack of self-confidence and confidence in her ability to exercise appropriate judgment, social withdrawal, marked enervation, and problems both initiating and persisting at tasks. (R. at 379.) Lanthorn also completed an assessment of Lawson's mental work-related abilities on which he found that her abilities to relate to co-workers, to deal with the public, to interact with supervisors, to deal with work stresses, to maintain attention and concentration, to understand, remember and carry out complex job instructions, to relate predictably in social situations and to demonstrate reliability were seriously limited, but not precluded. (R. at 380-81.)

Lawson began treatment with Arthritis Associates in May 2004. (R. at 411-12.) A May 24, 2004, note states that Lawson had been treated with Methotrexate for six weeks, her morning pain and stiffness had subsided and she was experiencing minimal joint pain. (R. at 412.) The note stated that Lawson's response to the treatment suggested that she suffered from rheumatoid arthritis. (R. at 412.)

Lawson was seen by Dr. Ronald Smith, M.D., of Psychiatric Associates of Kingsport, on June 24, 2004. (R. at 414-18.) Lawson complained of feeling depressed and wanting to "hide away." (R. at 418.) Lawson also complained of occasional crying spells, low energy level, constant worrying, poor concentration,

_____

(American Psychiatric Association 1994). A GAF of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning ...." DSM-IV at 32. A GAF of 51-60 indicates "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32.

hyperventilation and a smothering sensation when in crowds. (R. at 418.) Dr. Smith diagnosed Lawson as suffering from major depression, recurrent, and a generalized anxiety disorder. (R. at 415.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2005); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2005).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2) (West 2003 & Supp. 2005); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

-21-

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

In her brief, Lawson argues that the ALJ erred by failing to find that she suffered from a severe impairment. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 8-16.) The Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. § 404.1521(a) (2005). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking,

-22-

understanding, carrying out and remembering job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. § 404.1521(b) (2005). The Fourth Circuit held in *Evans v. Heckler*, that "'"[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."'" 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)) (citations omitted).

Based on my review of the record, I find that substantial evidence does not exist in this case to support the ALJ's finding that Lawson did not suffer from a severe physical impairment. Every physician who has expressed an opinion on the topic, except two, have placed restrictions on Lawson's physical work-related activities. In particular, Dr. Shamiyeh, Lawson's treating general practitioner, stated in 2003 that Lawson would be capable of performing less than the full range of light work.[3] (R. at 390-93.) In 1999, Dr. Johnson, a state agency physician stated that Lawson was limited to medium work.[4] (R. at 186-93.) In March 2001, Drs. Hartman and Hays, both state agency physicians, stated that Lawson was limited to medium work. (R. at 293-300.) The only evidence contradicting this is the opinion of the medical expert who testified at the hearing that Lawson did not suffer from a severe impairment and

---

[3]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, she also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2005).

[4]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2005).

-23-

Dr. Hays's 2001 assessment contradicting his earlier assessment and stating that Lawson's conditions did not place any limitations on her work-related abilities. (R. at 344-52.) I find that this does not provide substantial support for the ALJ's decision, especially in light of the recent evidence supporting a finding that Lawson may suffer for rheumatoid arthritis.

I also find that substantial evidence does not exist in this record to support the ALJ's finding that Lawson did not suffer from a severe mental impairment. Only one state agency psychologist, who did not evaluate Lawson, has stated that Lawson did not suffer from a severe mental impairment. (R. at 278-92.) It is also important to note that this opinion was rendered without the benefit of being able to review the treatment notes from Ramsden, Lawson's treating social worker. (R. at 292.) In particular, in April 2001 Ramsden noted serious limitations on Lawson's work-related mental abilities. (R. at 274-75.) In May 2001, Tenison, a state agency psychologist, stated that Lawson did suffer from a severe mental impairment, but he did expect it to last 12 months with treatment. (R. at 301-14.) In July 2001, Spangler placed significant limitations on Lawson's work-related abilities as a result of his evaluation. (R. at 323-24.) In December 2001, Milan, another state agency psychologist, found that Lawson suffered from a anxiety disorder. (R. at 328-43.) Also, Lanthorn evaluated Lawson in 2003 and placed significant restrictions on her mental work-related abilities. (R. at 380-81.) Furthermore, the psychological expert called to testify at Lawson's hearing simply stated that he was unable to render an opinion as to whether she suffered from a severe mental impairment. (R. at 455-56.)

*IV. Conclusion*

For the foregoing reasons, Lawson's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be denied, the Commissioner's decision to deny benefits will be vacated, and Lawson's claim will be remanded to the Commissioner for further consideration.

An appropriate order will be entered.

DATED:      This 21st day of November 2005.

/s/   *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-25-